[No. C059259. Third Dist. May 3, 2011.]

JOANNA R. MENDOZA, Plaintiff and Respondent, v.
JEFFREY WICHMANN et al., Defendants and Appellants.

**COUNSEL**

Klaus J. Kolb for Defendant and Appellant Jeffrey Wichmann.

David T. Ludington for Defendant and Appellant Klaus J. Kolb.

Freidberg & Parker, Edward Freidberg, Susanna V. Pullen and Port J. Parker for Plaintiff and Respondent.

**OPINION**

**NICHOLSON, J.**—The trial court denied defendants' motion to strike plaintiff's malicious prosecution complaint as a SLAPP, ruling plaintiff had introduced sufficient evidence of her likelihood of succeeding on the merits.[1]

We reverse. We find on the undisputed facts that defendants had probable cause to bring the underlying action, and thus plaintiff cannot establish an element of her malicious prosecution claim. We direct the trial court to enter a new order granting defendants' motion and dismissing the malicious prosecution complaint.

### INTRODUCTION[2]

Defendant Jeffrey Wichmann was a defendant in a civil action in Yolo County captioned "Dale M. Wallis v. PHL Associates, Inc., et al." (the Wallis

---

[1] "SLAPP is an acronym for Strategic Lawsuit Against Public Participation. SLAPP litigation, generally, is litigation without merit filed to dissuade or punish the exercise of First Amendment rights of defendants. [Citations.]" (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858 [44 Cal.Rptr.2d 46].)

[2] We take judicial notice of our unpublished opinions in *Wichmann v. Livingston & Mattesich Law Corp.* (Oct. 29, 2001, C037241) (nonpub. opn.) (*Wichmann I*) and *Wichmann v. Mendoza* (Nov. 17, 2005, C047202) (nonpub. opn.) (*Wichmann II*) and rely upon their findings of fact as necessary.

action). Plaintiff Joanna R. Mendoza was the attorney for Dale Wallis in the Wallis action. In that action, Wallis claimed her former employer, PHL Associates, Inc. (PHL), which Wichmann partially owned, had wrongfully terminated her. The lawsuit involved ownership rights to a vaccine that Wallis claimed she developed while employed at PHL. A mistrial was declared on the first trial, but at the second trial, a jury found Wichmann liable. However, no judgment has been entered pending trial of a cross-complaint Wichmann filed in the action. (*Wichmann I, supra*, C037241.)[3]

The events giving rise to this case began to unfold after jury deliberations commenced in the second trial of the Wallis action. Because Wallis and Mendoza had experienced a number of incidents of vandalism and harassment, and because they believed Wichmann was responsible for these incidents, Carol Livingston, the managing principal of Mendoza's law firm, Livingston and Mattesich (L&M), was notified of Mendoza's safety concerns. Livingston contacted a representative of the owner of the building in which L&M's offices were located and relayed those concerns. Livingston also gave the building's security guard Wichmann's name, description, and picture. Someone made a report to the police department, although Livingston and L&M denied they did it. (*Wichmann I, supra*, C037241.)

While the jury was deliberating in the Wallis action, the trial judge called a conference of all parties in the action and handed them a copy of the police report. The report stated Sheri Woodward, property manager of the L&M building, advised the authorities that Wichmann was "very unstable, [had] called in threats and [had] participated in the vandalism of [the] law firm's vehicles." In response, Wichmann filed an action against Mendoza, Livingston, and L&M for defamation. (*Wichmann v. Livingston & Mattesich Law Corp.* (Super. Ct. Sacramento County, No. 00AS04943).)

Mendoza, Livingston, and L&M brought a motion to strike Wichmann's defamation complaint pursuant to Code of Civil Procedure section 425.16, otherwise known as an anti-SLAPP motion.[4] The trial court denied the motion. We affirmed the trial court's ruling. (*Wichmann I, supra*, C037241.)

---

[3] Although the Wallis action is not yet final, it has already generated several appeals. In addition to this case and the cases cited in footnote 2, *ante*, it has generated the following appeals: *Wallis v. Strohl* (May 3, 2002, C035172) (nonpub. opn.); *Wallis v. PHL Associates, Inc.* (Feb. 28, 2006, C047182) (nonpub. opn.); *PHL Associates, Inc. v. Wallis* (Oct. 3, 2007, C053105) (nonpub. opn.); and *Wallis v. PHL Associates, Inc.* (2008) 168 Cal.App.4th 882 [86 Cal.Rptr.3d 297].

[4] Further undesignated references to sections are to the Code of Civil Procedure.

Later, L&M filed a motion for summary judgment against the defamation complaint. Mendoza was not a party to that motion. The trial court denied the motion, finding that material questions of fact remained for trial. L&M and Wichmann subsequently began settlement negotiations.

Meanwhile, the trial court ordered the parties to proceed with judicial arbitration. The arbitrator denied Wichmann's defamation claim and awarded costs to defendants in that action. Wichmann rejected the arbitration award and requested a trial de novo of his claims against Mendoza and L&M.

Subsequently, Wichmann entered into a settlement agreement with L&M in which he received a substantial settlement. (*Wichmann II, supra*, C047202.) The trial court determined the settlement was in good faith. Mendoza was not a party to the settlement agreement, and the agreement did not require Wichmann to dismiss Mendoza from the action. Wichmann then voluntarily filed a request for dismissal of the defamation action against Mendoza with prejudice. The superior court clerk entered the dismissal as requested. (*Wichmann II, supra*, C047202.)

Mendoza filed a motion to vacate the request for trial de novo, vacate the dismissal of the action against her, and enter judgment in her favor on the arbitration award. The trial court denied the motion. We reversed the trial court's order and directed the trial court to enter the arbitration award as a judgment. (*Wichmann II, supra*, C047202.)

Nearly two years later, Mendoza filed this action against Wichmann and Wichmann's attorney in the defamation action, defendant Klaus J. Kolb, for malicious prosecution of the defamation action against her. Wichmann filed an anti-SLAPP motion against the complaint, and Kolb filed a request for joinder in the motion.

The trial court granted Kolb's request for joinder, but it denied the anti-SLAPP motions. It ruled Mendoza had shown a probability of success on the merits of her malicious prosecution claim.

Wichmann and Kolb appeal from that determination. They claim the trial court erred when it denied their anti-SLAPP motions. They argue that Mendoza cannot show a probability of successfully proving all of the elements of her malicious prosecution claim, asserting the defamation action did not end in a favorable termination for Mendoza, and Wichmann and Kolb had probable cause to pursue the defamation action. Wichmann also claims

he brought the defamation action on the advice of counsel and thus cannot be liable for malicious prosecution. Additionally, Kolb claims he cannot be held liable for bringing the defamation action because Mendoza offered no evidence of malice on his part.

## FACTS

We provide a detailed statement of the relevant facts. Because we decide this matter on Wichmann's probable cause to bring the defamation action, we focus on preliminary facts that allegedly caused Mendoza to be concerned for her security, the facts as known by Wichmann and Kolb at the time they filed the defamation action, the facts they learned after they had filed that action, and the trial court's resolution of their anti-SLAPP motion against Mendoza's malicious prosecution action.

### 1. *Facts causing Mendoza to be concerned for her security*

Initially, we discuss some incidents between Wichmann, Mendoza, and Wallis that, according to Mendoza, gave rise to her concerns about her security and the security of L&M. These concerns eventually led to the creation of the police report that accused Wichmann of being unstable, making threats, and committing acts of vandalism.

Mendoza, acting as counsel for Wallis in the Wallis action, deposed Wichmann on April 29, 1999, prior to the first trial in that case. Wichmann had learned that morning that Mendoza had served a subpoena on a medical facility to obtain copies of medical records of a codefendant, who happened to have been Wichmann's stepbrother. The following exchanges occurred during the deposition, with the italicized words representing statements Mendoza claims she found to be threatening to her:

"MS. MENDOZA: Let the record reflect the witness [(Wichmann)] has stepped outside with counsel for a period of time to discuss something with both attorneys.

"Q [(by Mendoza)]: Do you recall being present at a meeting of the board of directors for September 19th, 1989?

"MR. GLICK [(Wichmann's trial counsel in the Wallis action)]: Move to strike counsel's paranoid comments. You can proceed.

"THE WITNESS: *Maybe she should be paranoid.* Okay. I'm looking at this." (Italics added.)

And then later:

"THE WITNESS: Doesn't that mean anything to you [(directing his comments at Mendoza)] that we've had witness after witness that has said [Wallis] hasn't developed crap? She can't make oatmeal. You have no witnesses at all. You don't have no shred—you don't have one document that shows she developed anything, and you're continuing to represent her. There is really something either wrong with her or you or both of you, I guess. I'm not real sure. It's very surprising, very confusing.

"MS. MENDOZA: Anything you want to add to that? ·

"A [(WICHMANN)]: Maybe.

"Q Feel free.

"MR. GLICK: Go ahead. She's asking you to talk.

"MS. MENDOZA: Yeah.

"A [(WICHMANN)]: I'm sure I'll find a proper time.

"*You do know if we have any money left after this, that we are—we're going to turn around. You know that.* Whether it's summary judgment or whatever, we're not going to—the one thing I can't believe is that [Wallis] would go after Tom's personal medical records after the way that he treated her. You don't know.

"This woman came in. She had no experience. We gave her everything. We showed her how to do everything. My father showed her how to do everything. We gave her raises. We showed her the ins and outs. We showed her how to go to shows. We showed her how to dress. We had to send her to a psychologist. She was a very unstable person. And for her to do something underhanded, and for you to agree to it like go after his medical records for something that happened ten years ago is pretty despicable.

"And I think that *you should be thinking about that*, and I think *you should be thinking about parading elderly doctors, like my father, into testimony* which they have no business being in. *You are ruining people's lives here* and you don't seem to give a damn. And that's all for right now.

"Q [(MENDOZA)]: Okay. On the third page—

"MR. GLICK: Do you need to take a break, Jeff?

"THE WITNESS: I'm okay.

"Q [(MENDOZA)]: On the third page of this Exhibit . . . ." (Italics added.)

Another incident Mendoza claims to find threatening occurred in August 1999 during the first trial of the Wallis action. Apparently, the trial court granted an in limine motion to exclude any evidence of alleged drug use by Wichmann and the other defendants. On Wallis's redirect testimony, however, Wallis stated Wichmann had sold marijuana to employees at PHL. After Wallis was released from the witness stand, Wichmann made a comment to her. The parties disagree about what he said. A paralegal for Mendoza stated Wichmann told Wallis, "You better watch it, Dale, if you keep your fucking lies going . . . about the marijuana." Wichmann declared he "turned to [Wallis] and said, 'Keep it up Dale, keep the lies up. Marijuana?'—or words very close to this."

Mendoza did not hear what Wichmann said to Wallis, but she found out afterward. The bailiff ultimately filed a report of the incident with the Yolo County Sheriff's Department. According to Mendoza, the trial court thereafter ordered the parties to have no communication of any kind with each other. Also, additional deputies were present in the courtroom from that point, and Mendoza and her staff were escorted to their offices by sheriff's deputies for their safety.

Counsel for PHL and other defendants in the Wallis action asked the court to declare a mistrial on account of Wallis's testimony about Wichmann. The court agreed that Mendoza and Wallis had violated the in limine order, stating Wallis's testimony "was a bad mistake on the plaintiff's [(Wallis's)] side, a really, really bad mistake . . . ." However, the court denied the requests for a mistrial. (The court later declared a mistrial, but it did so on a different ground.)

2. *Facts known at the time of filing the defamation action*

We next focus on the facts known to Wichmann and Kolb at the time they filed the defamation action on September 8, 2000. In summary, Wichmann and Kolb did not have direct evidence linking Mendoza to the defamatory statements that were contained in the police report about Wichmann. However, they knew the statements originated with someone at L&M. They also knew that Livingston, who relayed the information to employees of the building's owner, did not know Wichmann and allegedly did not even know

his name. But Mendoza knew Wichmann from their interactions in the Wallis action. In addition, the accusations against Wichmann in the police report were similar to accusations Mendoza had made against Wichmann during the Wallis action.

On June 12, 2000, the trial judge in the Wallis action's second trial directed Mendoza and Wichmann's attorney to his chambers. There, he gave them copies of an incident report prepared by the Sacramento Police Department. According to the report, Officer Hubbard and Sergeant Thorpe on June 9, 2000, met with Sheri Woodward of Rotunda Partners, the property manager of the building that housed L&M's offices. The report stated: "Woodward advised they are concerned about the suspect (Wichmann), retaliating against [L&M]. . . . Wichmann may lose 20 million dollars Monday in a court verdict being prosecuted by this law firm. The trial is being held in Yolo County. *Suspect Wichmann is very unstable, has called in threats and has participated in the vandalism of this law firm's vehicles.* Woodward advised they will be hiring armed security starting Monday. Woodward also advised if Wichmann shows up they will be locking out the elevator and hitting the panic alarm for P.D. response. Woodward may also get a restraining order." (Italics added.)

Wichmann was "extremely upset" about the contents of the incident report and "baffled" how it could have occurred. He claimed the allegations were false. He contacted the Sacramento Police Department and met with Officer Gardella. He was told the report would be on his permanent record. He was also told he could write a rebuttal, but he decided it would be better for whoever made the report to write the rebuttal. He learned Woodward was the person who called in and spoke with the officers who filed the report. Officer Gardella also stated it was highly unusual for police officers to deliver an incident report at 8:00 a.m. to a judge in the middle of an ongoing trial.

Wichmann was suspicious that Mendoza was somehow involved in the incident report: "I guess the one thing I did know is Sheri Woodward did not know me. Carol Livingston had never met me. And I believe at the time I was suspicious that the only person that really could have conveyed this information was Joanna Mendoza." Wichmann had strong suspicions but did not know in fact whether Mendoza caused the incident report to be delivered to the judge. In his opinion, "[I]t was not lost on anyone that delivering an incident report like this to a judge in a case like we had certainly couldn't hurt her."

Wichmann retained Attorney William Portanova to determine the source of the incident report and obtain a retraction. Portanova's investigator contacted Sergeant Thorpe, the Sacramento police officer who approved the incident report. Sergeant Thorpe stated he and Officer Hubbard met with Woodward, at her request, on June 9, 2000, for input on what additional security measures could be taken to protect her building and L&M. Woodward stated a verdict was expected in a Yolo County case where defendant could "go postal" on L&M. The officers were not there to conduct an investigation into any threats of vandalism, but only to counsel on possible security measures. It was apparent to Sergeant Thorpe that Woodward's information about Wichmann was not firsthand, and that she had been approached and told things by other people.

After preparing the incident report, Sergeant Thorpe directed Officer Hubbard to deliver a copy of it to the Yolo County courts. He did this because he felt that if there was a possibility of a threat by Wichmann as alleged by Woodward, it could happen in the courtroom where plaintiff's attorneys were within close proximity.

Portanova spoke with Woodward in July 2000. Woodward stated none of the information contained in the police incident report was known to her personally. Each of the assertions in the report was conveyed to her by Carol Livingston at L&M. Portanova obtained a declaration from Woodward stating on June 9 she gave the police officers information that had been provided to her by L&M. The police officers knew that someone other than Woodward was the source of the information. Woodward also stated that "[c]ertain facts contained in the report incorrectly summarize the information that I provided."

Wichmann had Portanova contact L&M in order to get the desired retraction. Wichmann gave this direction because L&M was "in the building at the time of Sheri Woodward's declaration, and because Joanna Mendoza worked for [L&M]. . . . [¶] . . . I guess you could say that it seemed like all the trails led to their offices."

Portanova exchanged telephone conversations and correspondence with Livingston of L&M. In conversations, Livingston denied identifying Wichmann as the source of threats or vandalism. However, in a letter to Livingston dated August 4, 2000, Portanova informed her that Woodward had told him all of her information concerning this situation came from L&M, and that Livingston was Woodward's point of contact with the firm. Portanova summarized: "As of this writing, the headwaters of the flow of information contained in the police report appear to be in your offices."

Livingston responded by letter dated August 21, 2000. She recounted the history of the Wallis case that led to her contacting Woodward. She mentioned the incident that occurred during the first trial when Wichmann made a comment to Wallis that Mendoza and Wallis interpreted as a personal threat.

Livingston also claimed that during the course of the Wallis case, Mendoza's and Wallis's cars were vandalized several times, on the same days, and in identical ways. Wallis also suffered acts of vandalism to her home, received harassing phone calls, and had a bullet shot through her car's windshield. Because of these facts, because Mendoza represented Wallis, and because they expected a verdict against Wichmann, Livingston believed there was reason to be cautious and to contact Woodward.

Livingston stated she gave these facts to Woodward and informed Woodward they did not know who was responsible for the vandalism. Livingston wrote she did not give Woodward Wichmann's name until after the police report was filed. She claimed at the time she met with Woodward she did not even remember Wichmann's name. She did, however, give Woodward a physical description of Wichmann and a picture of him. Later, at the request of the building's day guard, Livingston learned Wichmann's name and gave it to the guard on a small piece of paper. She told him never to show it to anyone else.

Livingston stated that after her initial conversation with Woodward, Woodward over the next couple of days asked for more detailed information. Livingston related the above facts to Woodward as she learned them. She told Woodward she was not accusing Wichmann of anything. She stated L&M never told Woodward or the police that Wichmann was responsible for the vandalism mentioned in the police report.

By the end of Portanova's investigation, neither Woodward nor Livingston would provide a retraction to the statements made in the police report. Wichmann asked as many as four attorneys, including Kolb, whether there was anything else he could do to obtain retractions and find out who made the defamatory statements. His attorneys advised him the only way he could compel sworn statements was to file a complaint and use the judicial process to determine who was telling the truth and who was responsible for the defamatory statements.

Wichmann first contacted Kolb in August 2000 for purposes of representing him in a defamation action. Kolb had represented another defendant in the Wallis action. Wichmann signed a letter written by Kolb and dated September 3, 2000, formally retaining Kolb. In that letter, Kolb stated that, as he and Wichmann had previously discussed, there were "a number of risks and potential obstacles to overcome in any attempt to seek legal redress" for

the false statements. One of those issues was whether the statements referenced in the police report were protected under an absolute or qualified privilege. Another was the fact that Wichmann had not been able to obtain a complete or consistent account of how the statements came to be. Kolb could not guarantee that the witnesses would tell the truth even if legal process was used to obtain their statements. "In short, the outcome of any legal action taken to correct the police report or seek redress for your injuries is uncertain, and I can give no assurance that you will obtain a successful outcome."

Kolb wrote what his next steps would be: "Having discussed potential risks and difficulties involved in pursing this action, I am prepared to move forward immediately to pursue legal remedies on your behalf. As we have previously discussed, this includes some additional legal research concerning the scope of privileges that might apply to the defamatory statements, and appropriate causes of action against the potential defendants identified above. It is my goal to have a draft complaint ready for your review by Wednesday morning, if I conclude we have sufficient facts and a legal basis for filing a complaint."

In the meantime, Kolb contacted Livingston to attempt an informal resolution of Wichmann's grievances, but he was not successful. Wichmann then authorized Kolb to file the defamation action. Kolb had explained the costs and risks involved in bringing the action, but he believed the action had merit. Wichmann relied on Kolb's assessment of the case, as well as Kolb's determinations of who to name as a defendant and what allegations to make. This included Kolb's recommendation to name Mendoza as a defendant.

Wichmann admitted at his deposition that at the time of filing the complaint, he did not know if Mendoza had made the statements that ended up in the police report. He also stated his attorneys and investigators had not conclusively determined by that time that Mendoza had made the statements. He agreed with Kolb at that time that the statements most likely originated from L&M's offices, and he believed that Mendoza was at least one of the persons involved in communicating the information. He had never met Woodward or Livingston, but the allegations contained in the police report were based on information to which only Mendoza and Wallis, and possibly Livingston, had been privy.

Wichmann knew that Mendoza, during the Wallis action, had accused him of vandalizing vehicles and making threats, of following Wallis, and of being "unstable"—the same actions alleged in the police report. In addition, Wallis, under Mendoza's questioning, accused Wichmann during the Wallis action of selling drugs at PHL. From all of these events, Wichmann believed Mendoza harbored animosity and ill will towards him. Wichmann informed Kolb of the

reasons for his suspicion that Mendoza was involved with the police report. And Kolb proceeded to file the defamation complaint.

### 3. *Facts learned after the defamation action was filed*

Discovery done after the defamation action was filed still did not disclose direct evidence that Mendoza had made the defamatory statements. However, Wichmann and Kolb learned that Mendoza had participated in the meeting where the information about Wichmann was given to Woodward and other Rotunda Partners personnel. In fact, there was evidence that Mendoza mentioned Wichmann's name during the meeting.

In a sworn declaration, Woodward stated Livingston came into her office on June 8, 2000, wanting to arrange additional security measures for her firm's offices for when a large verdict came in. Livingston said that one of the defendants in the action had made a threat in court and had shown behavior that was cause for concern. There also had been vandalism against vehicles owned by L&M's client and attorneys working on the case. The vandalism had coincided with various court rulings and thus appeared to be connected with the case. Livingston arranged a meeting for that afternoon in L&M's offices regarding her request for additional security.

The meeting lasted from 30 minutes to one hour. Approximately 10 to 15 people attended the meeting. Woodward attended the meeting along with two other Rotunda Partners employees, Joe Friedmann and Paul Malyj. Numerous L&M personnel attended, including Livingston and Mendoza. Woodward recalled that Livingston and Mendoza "did most of the talking during the meeting." The attendees received a description of an individual and were shown portions of the individual's videotaped deposition. Later during the meeting, Woodward and Friedmann were informed the individual was Wichmann. Livingston told them how to pronounce his name. The attendees were told that Wichmann had made a threat in the courtroom and had displayed anger there. They were also told about the vandalism and that L&M suspected the vandalism was connected to the case.

Woodward stated that no one specifically said Wichmann had committed the vandalism. However, no individual other than Wichmann was specifically named as a potential security risk, and Woodward left the meeting with the strong impression that Wichmann was a likely party to the vandalism.

Woodward telephoned the Sacramento Police Department to ask whether the department could provide hired officers or provide suggestions about improving security at the building. She was told the department could not help because no specific incident had occurred.

However, the next day, June 9, 2000, two police officers unexpectedly arrived at Woodward's office. They asked for additional information about the circumstances that had prompted her to call the department. She relayed to them the information L&M had given her, including Wichmann's name and description.

At some later time, Woodward received a copy of the police incident report that had been filed in the matter. Woodward believed the report was misleading, as it seemed to attribute to her a personal knowledge of the facts. The information she provided to police was the information she received from L&M. For example, she did not tell police that Wichmann had called in a threat. Rather, she had told them he had made a threat in court.

Malyj and Friedmann also provided sworn declarations, and their statements reflected the same facts attested by Woodward.

In her deposition, Mendoza stated she attended the afternoon meeting with Woodward and other Rotunda Partners personnel. She could not remember if Livingston attended this meeting. Before the meeting, she met with Livingston and told her of the security concerns she and Wallis shared. Mendoza mentioned Wichmann's name to Livingston as the only defendant that she actually had some indication had done anything specifically, and that consisted of the threats against her and Wallis. Mendoza provided Livingston with a copy of the videotape of Wichmann's deposition that recorded Wichmann making statements Mendoza interpreted as being threatening.

At the meeting with Woodward, a portion of the videotape of Wichmann's deposition was played. A photograph of Wichmann was made for Woodward from the videotape. Mendoza could not remember who decided to play the videotape or provided Woodward with the photograph. Mendoza did not remember if she spoke with Woodward during the meeting. Indeed, in her words, "I don't recall everything or anything that I said if I said anything . . . . [¶] . . . [¶] I recall very little about the meeting."

Livingston, in her deposition, stated she did not know who selected the videotape to show at the meeting, but her reasonable guess was Mendoza. Livingston stated she never saw Mendoza prior to the meeting. However, Livingston was certain Mendoza mentioned Wichmann's name during the meeting when the Rotunda Partners personnel asked for the name of the individual.

### 4. *Trial court's rulings*

As mentioned above, L&M and Mendoza filed an anti-SLAPP motion against the defamation complaint, which the trial court denied. L&M filed a

motion for summary judgment against the complaint, and the trial court denied that also. L&M settled with Wichmann, but Mendoza did not. Ultimately, the arbitrator's award in favor of Mendoza was entered as the judgment. Mendoza then filed this action for malicious prosecution.

Wichmann and Kolb filed the anti-SLAPP motion against the complaint which is the focus of this appeal. The trial court denied the motion. The court concluded Mendoza had demonstrated a probability of success on the merits so as to withstand the anti-SLAPP motion. The court stated that in order for Mendoza to prevail on her malicious prosecution claim, she had to establish the defamation action (1) was commenced by Wichmann and pursued to a legal termination in Mendoza's favor; (2) was brought without probable cause; and (3) was initiated with malice. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel Co.*).) It found Mendoza submitted sufficient evidence on each of these elements.

The court found the defamation action was commenced by Wichmann. It also determined the action was pursued to a legal termination in favor of Mendoza in the form of the judgment entered on the arbitration award.

The court ruled Mendoza submitted sufficient evidence showing Wichmann and Kolb had prosecuted the defamation action without probable cause. Wichmann and Kolb had argued that the denial of Mendoza's anti-SLAPP motion and L&M's summary judgment motion against the defamation complaint established probable cause as a matter of law. The court rejected this argument. By statute, the denial of an anti-SLAPP motion could not be used in any subsequent action. (§ 425.16, subd. (b)(3).) And, because Mendoza had not been a party to L&M's summary judgment motion, the ruling denying that motion could not be used to determine as a matter of law the sufficiency of the facts pleaded against Mendoza in the defamation action.

The court held that Wichmann lacked probable cause to sue Mendoza for defamation because he lacked sufficient evidence that she was the source of the defamatory remarks. The court wrote: "It is apparent from his testimony that Wichmann inferred that Mendoza was the source of the defamatory statements in the incident report, because she called him 'unstable' to his face, and the incident report used the same word. [¶] The court finds that inferences drawn by Wichmann that effect [*sic*] that Mendoza was the source of the statements in the incident report are not reasonably deducible from any evidence."

Mirroring the test traditionally applied for determining in a malicious prosecution action the existence of probable cause in the underlying action,

Wichmann argued the anti-SLAPP motion should be granted because an attorney could have a good faith belief that the defamation action had at least some merit. Relying upon our decision in *Kreeger v. Wanland* (2006) 141 Cal.App.4th 826 [46 Cal.Rptr.3d 790] (*Kreeger*), the trial court rejected this argument. Instead of applying the malicious prosecution test for determining probable cause, it applied the traditional test for reviewing an anti-SLAPP motion. Using that test, the court determined Mendoza had submitted enough evidence of lack of probable cause to meet the "minimal merit" test required to survive an anti-SLAPP motion.

The court also concluded Mendoza had submitted sufficient evidence showing the defamation action was filed against her with malice. Both Wichmann and Kolb knew there was no direct evidence linking Mendoza to the defamatory statements. Kolb knew there was animosity between Wichmann and Mendoza arising from the Wallis action, and Wichmann knew when he hired Kolb that Kolb disliked Mendoza on account of their participation in the Wallis action. The court found this was a sufficient showing of malice to withstand the anti-SLAPP motion.

Finally, the court rejected Wichmann's defense of relying on the advice of counsel. It determined the defense was not available where the party relying on it knew he did not have probable cause to bring the underlying action. The defense also was not available here because Wichmann had failed to make a full and fair disclosure to Kolb. According to the court, Wichmann knew he had no facts to support a defamation action against Mendoza, but he hired Kolb to pursue the action anyway even though Kolb had warned him the suit could backfire and result in a claim against them.

Wichmann and Kolb now appeal. They challenge each of the trial court's reasons for denying their anti-SLAPP motion against Mendoza's complaint for malicious prosecution.

## DISCUSSION

### I

### *Standard of Review*

Subdivision (b)(1) of section 425.16 sets forth the elements of an anti-SLAPP motion. It provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special

motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid.*)

"[S]ection 425.16 requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) [Second,] [i]f the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim. [Citation.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76 [124 Cal.Rptr.2d 519, 52 P.3d 695] (*Cotati*).)

■ The first step of this test is not at issue here. "[B]y its terms, section 425.16 potentially may apply to every malicious prosecution action, because every such action arises from an underlying lawsuit, or petition to the judicial branch. By definition, a malicious prosecution suit alleges that the defendant committed a tort by filing a lawsuit. [Citation.] Accordingly, every Court of Appeal that has addressed the question has concluded that malicious prosecution causes of action fall within the purview of the anti-SLAPP statute. [Citations.]" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 734–735 [3 Cal.Rptr.3d 636, 74 P.3d 737], fn. omitted.) The parties do not contest this point.

■ We thus focus on the second step for resolving this anti-SLAPP motion, whether Mendoza has demonstrated a probability of prevailing on her claim of malicious prosecution. "[S]ection 425.16 does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning. It subjects to potential dismissal only those causes of action as to which the plaintiff is unable to show a probability of prevailing on the merits (§ 425.16, subd. (b)), a provision we have read as 'requiring the court to determine only if the plaintiff has stated and substantiated a legally sufficient claim' [citation]." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 63 [124 Cal.Rptr.2d 507, 52 P.3d 685].) " 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89 [124 Cal.Rptr.2d 530, 52 P.3d 703].) The anti-SLAPP statute "poses no obstacle to suits that possess minimal merit." (*Id.* at p. 93.)

We review the trial court's ruling de novo, and apply our independent judgment to determine whether Mendoza has shown a probability of prevailing on her claim of malicious prosecution. (*Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1084 [70 Cal.Rptr.3d 614].)

Wichmann and Kolb claim the trial court erred by denying their anti-SLAPP motions because Mendoza failed to introduce sufficient evidence to show a likelihood of establishing the elements of a claim for malicious prosecution. They argue the defamation action did not end in a favorable termination for Mendoza, and Wichmann and Kolb had probable cause to pursue the defamation action. In addition, Wichmann argues he established the advice of counsel defense to Mendoza's claim. Kolb asserts Mendoza submitted no admissible evidence of malice by him in bringing the defamation action.

Based upon the evidence before us, we conclude Wichmann and Kolb had probable cause to file and prosecute the defamation action against Mendoza. Accordingly, Mendoza cannot establish a likelihood of success on her malicious prosecution claim. We limit our discussion to the issue of probable cause, and thus do not address Wichmann's and Kolb's additional arguments.

## II

### *Probable Cause*

Mendoza claims Wichmann and Kolb lacked probable cause to initiate and prosecute the defamation action against her. She reaches this conclusion based on the fact that Wichmann and Kolb have not produced any direct evidence establishing that she made the remarks about Wichmann that ultimately appeared in the police report. She asserts Wichmann knew he had no direct evidence that Mendoza made the statements, and knew the facts as known to him and Kolb at the time they filed the defamation action raised issues of absolute and qualified privileges, but he nonetheless authorized Kolb to file the action.

Wichmann and Kolb claim Mendoza failed to establish a likelihood of success on the issue of probable cause. They claim our decision affirming the denial of Mendoza's anti-SLAPP motion against the defamation complaint, the trial court's denial of L&M's summary judgment motion against that complaint, and the other evidence they submitted established probable cause for filing the defamation action as a matter of law.

We conclude the undisputed evidence indicates Wichmann and Kolb had probable cause to file and prosecute the defamation action against Mendoza.[5]

---

[5] The trial court correctly determined its prior rulings in this matter did not establish probable cause as a matter of law. By statute, the court's denial of Mendoza's anti-SLAPP motion against the defamation complaint is not admissible in any subsequent action. (§ 425.16,

■ "The question of probable cause is 'whether, as an objective matter, the prior action was legally tenable or not.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292 [46 Cal.Rptr.3d 638, 139 P.3d 30].) Probable cause "is ' "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true." ' [Citations.]" (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 55 [118 Cal.Rptr. 184, 529 P.2d 608].)

"Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. '[T]he standard of probable cause to bring a civil suit [is] equivalent to that for determining the frivolousness of an appeal (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179]), i.e., probable cause exists if "any reasonable attorney would have thought the claim tenable." (*Sheldon Appel* [*Co.*], *supra*, [47 Cal.3d] at p. 886.) This rather lenient standard for bringing a civil action reflects "the important public policy of avoiding the chilling of novel or debatable legal claims." (*Id.* at p. 885.) Attorneys and litigants . . . " 'have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . .' " (*Ibid.*, quoting *In re Marriage of Flaherty, supra*, at p. 650.) Only those actions that " 'any reasonable attorney would agree [are] totally and completely without merit' " may form the basis for a malicious prosecution suit. (*Ibid.*)' (*Wilson* [*v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811,] 817 [123 Cal.Rptr.2d 19, 50 P.3d 733].)" (*Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1047–1048 [79 Cal.Rptr.3d 822].)

■ The existence of probable cause is determined by an objective test. To make a prima facie case of a lack of probable cause in response to the anti-SLAPP motion, Mendoza must submit substantial evidence showing no reasonable attorney would have thought the defamation action was tenable in light of the facts known to Wichmann and Kolb at the time the suit was filed (*Wilson v. Parker, Covert & Chidester, supra*, 28 Cal.4th at pp. 817, 822, fn. 6; *Ross v. Kish* (2006) 145 Cal.App.4th 188, 202 [51 Cal.Rptr.3d 484]), or that Wichmann and Kolb continued pursuing the lawsuit after they had discovered the action lacked probable cause. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 966–970 [12 Cal.Rptr.3d 54, 87 P.3d 802].) "Only those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit. [Citations.]" (*Id.* at p. 970.)

---

subd. (b)(3).) Also, the court's denial of L&M's summary judgment motion against the defamation complaint established no finding binding against Mendoza as to whether probable cause existed against her.

However, "[w]here there is no dispute as to the facts upon which an attorney acted in filing [or prosecuting] the prior action, the question of whether there was probable cause to institute [or continue prosecuting] that action is purely legal. (*Sheldon Appel Co., supra,* [47 Cal.3d] at pp. 868, 881; *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 496 [78 Cal.Rptr.2d 142].) If there is a dispute as to such facts, that dispute must be resolved by the trier of fact before the objective standard can be applied by the court. (*Sheldon Appel Co., supra,* at p. 881; *Downey Venture v. LMI Ins. Co., supra,* at p. 496, fn. 25.)" (*Ross v. Kish, supra,* 145 Cal.App.4th at p. 202.)

Here, the facts regarding probable cause are not in dispute. Thus, we resolve the issue of probable cause as a matter of law. This does not conflict with our holding in *Kreeger,* relied upon by the trial court. There, we stated the burden on a malicious prosecution plaintiff opposing an anti-SLAPP motion " 'is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment.' [Citation.] The plaintiff need only establish the challenged cause of action has 'minimal merit.' [Citations.]" (*Kreeger, supra,* 141 Cal.App.4th at p. 832.) However, we also stated that the plaintiffs in that malicious prosecution action would meet their "minimal merit" burden on their probable cause element by establishing that the defendants did not have probable cause to bring the underlying action. (*Id.* at pp. 833–834.)

To the extent we created any confusion in *Kreeger,* we take this occasion to clarify the rule we expressed in that case. Because the existence of probable cause may be a question of law, a malicious prosecution plaintiff opposing an anti-SLAPP motion where the facts surrounding probable cause in the underlying action are not in dispute must establish the defendant's lack of probable cause in the underlying action as a matter of law in order to survive an anti-SLAPP motion.[6] If the undisputed facts establish the existence of probable cause as a matter of law, there is no showing the plaintiff can make to demonstrate a likelihood of succeeding on the merits of her malicious prosecution complaint.

Mendoza introduced no facts to challenge those introduced by Wichmann and Kolb. Instead, she relied on the fact, admitted by Wichmann, that he and Kolb did not directly and personally know at the time of filing the defamation action that Mendoza made the defamatory statements. She raises no other arguments here to challenge Wichmann's probable cause.

---

[6] Mendoza asks us to take notice of the discussion of probable cause in *Daniels v. Robbins* (2010) 182 Cal.App.4th 204 [105 Cal.Rptr.3d 683]. The case does not aid us, as it involves disputed facts regarding probable cause. There are no disputed facts here on the issue of probable cause.

Obviously, in order to win his defamation claim against Mendoza, Wichmann would have to establish that Mendoza made the defamatory statements or took a "responsible part" in the publication of the statements. (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 549 [46 Cal.Rptr.2d 880].) But that is not the standard for determining probable cause. The issue here is whether there was sufficient undisputed circumstantial evidence at the time Wichmann filed and prosecuted his complaint on which any reasonable attorney could suspect that Mendoza made the defamatory remarks or took a responsible part in their publication. We conclude there was.

At the time Wichmann filed his defamation complaint, he knew the following, which Mendoza does not dispute: A filed police report stated he was unstable, had made threats, and had vandalized cars belonging to L&M attorneys and clients. He knew Mendoza had accused him of those actions before and had called him unstable. He knew the information for the police report came from Woodward, and that Woodward learned the information from Livingston. He did not know Woodward and Livingston, as they were not participants in the Wallis action. But he knew Mendoza, and she was an employee in Livingston's law firm. Livingston stated in her August 21, 2000, letter she did not know Wichmann's name and did not give his name to Woodward until *after* the police report, which contained Wichmann's name, had been filed. Thus, Wichmann knew that someone in L&M gave Wichmann's name to Woodward, and if Livingston did not know it and did not give it to Woodward before she spoke with the police, it was reasonable for Wichmann to suspect strongly that Mendoza had communicated his name and the information to Livingston and Woodward that formed the basis of the allegations in the police report. A reasonable attorney would have thought a defamation action against Mendoza was tenable under these facts.

To continue prosecuting the defamation action against Mendoza, Wichmann and Kolb would have to obtain evidence showing Mendoza made the defamatory statements or took a "responsible part" in the publication of the statements. (*Matson v. Dvorak, supra*, 40 Cal.App.4th at p. 549.) They obtained evidence that this occurred.

Their evidence, uncontested by Mendoza, showed that Mendoza met with Livingston prior to the June 8 meeting and participated in the meeting where information about Wichmann was given to Woodward. She and Livingston did most of the talking. At that meeting, Woodward received a description of Wichmann, was shown portions of Wichmann's videotaped deposition, received a photograph of Wichmann from the videotape, and was given Wichmann's name as the person depicted in this media and as the possible

security threat. She was told Wichmann had made threats and displayed anger in court. She was told vandalism was possibly related to the Wallis action, and Wichmann's was the only name she received in connection with L&M's security concerns. Livingston was certain Mendoza gave Wichmann's name to Woodward.

Mendoza does not dispute this evidence. She stated in her deposition she was the person who gave the videotape of Wichmann's deposition to Livingston. She also claimed she could not recall anything that she said at the meeting, or whether she even said anything at the meeting. Her failure to recall does not contradict the evidence by Woodward and Livingston that Mendoza said quite a bit at the meeting, including naming Wichmann as the suspected miscreant.

This was sufficient evidence of probable cause for continuing to prosecute the defamation action against Mendoza. It indicates Mendoza took a responsible part in telling Woodward that Wichmann was unstable and had made threats, and all but explicitly accusing Wichmann of the vandalism. She produced the videotape of Wichmann's deposition and she and Livingston conveyed Wichmann's name as the person the meeting was convened to discuss.

Although judgment was ultimately entered against Wichmann in the defamation action, that judgment has no bearing on whether Wichmann had probable cause to file and prosecute the action. At issue is whether there was no evidentiary support whatsoever for Wichmann's claim against Mendoza at the time he filed his action and as he prosecuted it. On this record, we conclude there was, indeed, sufficient undisputed evidence to support a reasonable attorney to initiate and prosecute Wichmann's claim against Mendoza.[7]

Accordingly, because probable cause existed, as a matter of law, to file and prosecute the defamation action, Mendoza cannot demonstrate she is likely to succeed on the merits of her malicious prosecution claim. She cannot prove Wichmann lacked probable cause, an element of her action. Because she cannot succeed on the merits, the anti-SLAPP motion against her complaint should have been granted.

[7] At oral argument, counsel for Mendoza argued there was no evidence of probable cause to support the defamation complaint's allegation that Mendoza "made" the defamatory statements. The undisputed evidence discussed above established probable cause that Mendoza made the statements. The circumstantial evidence created a reasonable suspicion that Mendoza made the statements.

## DISPOSITION

The trial court's order denying the anti-SLAPP motion is reversed. We direct the trial court to grant the motion and dismiss the malicious prosecution complaint with prejudice. Costs on appeal are awarded to Wichmann and Kolb. (Cal. Rules of Court, rule 8.278(a).)

Raye, P. J., and Blease, J., concurred.