Filed 4/10/14  Rahbarian v. Brasher's Sacramento Auto Auction CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PAIMAN RAHBARIAN  et al., | |
| Plaintiffs and Appellants, | C069312 |
| v. | (Super. Ct. No. 34201000080282CUBCGDS) |
| BRASHER'S SACRAMENTO AUTO AUCTION, INC., et al., | |
| Defendants and Respondents. | |

This appeal challenges the trial court's grant of a special motion to strike pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute,[1] directed at a cause of action for malicious prosecution.  In the underlying lawsuit, Brasher's Sacramento Auto Auction, Inc., (Brasher's) sued Luxury Imports of Sacramento, Inc., (Luxury) and several

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.  SLAPP is an acronym for "strategic lawsuit against public participation."

1

other defendants, including Paiman, Shayan, and Mike Rahbarian,[2] for several causes of action arising out of Luxury's default on a flooring line of credit extended to Luxury by Brasher's and secured by Luxury's entire vehicle inventory. The lawsuit asserted causes of action against Paiman for conversion and fraud. Following the voluntary dismissal of the fraud cause of action and a jury verdict in Paiman's favor on the conversion cause of action, Paiman sued Brasher's for malicious prosecution. The trial court granted the aforementioned anti-SLAPP motion, finding as a matter of law that Brasher's had probable cause to pursue its claims against Paiman. We agree with the trial court and affirm the order granting the anti-SLAPP motion.

BACKGROUND

Brasher's is a commercial automobile auctioneer and also provides floor financing for dealer purchases. In 2005, Luxury was created to own and operate a Suzuki dealership. Shayan was Luxury's president. Brasher's had a preexisting relationship with the Rahbarians, having sold vehicles to other companies operated by Mike and Paiman. Based on this relationship, in September 2005, Brasher's agreed to loan Luxury $2.9 million on a revolving line of credit to fund the purchase of vehicle inventory.

Luxury executed and delivered to Brasher's a promissory note, flooring agreement, and security agreement. The promissory note provided repayment of the loan would be in accordance with the flooring agreement. The flooring agreement provided two schedules for the repayment of money advanced for vehicle purchases. With respect to vehicles purchased from Brasher's, Luxury agreed to pay 10 percent of the purchase price not more than 30 days from the date of the advance, another 10 percent of the

---

[2]     Because these defendants in the underlying lawsuit share a common last name, we use their first names in this opinion for clarity and intend no disrespect. Collectively, we refer to them as the Rahbarians.

purchase price not more than 60 days from the date of the advance, and the entirety advanced for the purchase not more than 90 days from the date of the advance. A different repayment schedule was established for vehicles purchased from Suzuki. However, regardless of whether the vehicle was purchased from Brasher's or Suzuki, Luxury was required to pay Brasher's the full amount advanced for the purchase not more than two business days after the sale of such vehicle by Luxury. Sale proceeds were required to be held by Luxury in trust for Brasher's until the entirety of the advance was repaid.

In the event of default by Luxury, the promissory note, flooring agreement, and security agreement allowed Brasher's to declare all sums advanced immediately due and payable. The security agreement granted Brasher's a security interest in all personal property owned or thereafter acquired by Luxury (designated "the 'Collateral' "), including "[a]ll goods, merchandise, vehicles and other personal property." Upon default, the security agreement also granted Brasher's the right to enter Luxury's premises to "remove the Collateral therefrom to the premises of [Brasher's] or any agent of [Brasher's], in order to maintain, sell, collect or liquidate the Collateral."

Mike and Shayan also signed personal guarantees of all obligations of Luxury. An existing deed of trust granting Brasher's a security interest in certain real property owned by the Rahbarian Family Trust in connection with obligations owed to Brasher's by one of Mike's companies, Cars 4 Less, Inc., was also modified to secure Brasher's for payment of Luxury's obligations under the promissory note and flooring agreement.

### The Underlying Lawsuit

In June 2007, Brasher's sued Luxury and various other defendants, including Shayan and Mike, asserting causes of action for breach of the promissory note and flooring agreement, breach of the personal guarantees, default under the security agreement, foreclosure of the deed of trust, conversion of collateral, and wrongful

possession and detention of collateral.  An amended complaint, filed in December 2007, added Paiman as a defendant in the conversion and wrongful possession of collateral causes of action and asserted an additional cause of action against Paiman and others for fraud.  The fraud cause of action was voluntarily dismissed during trial.  The conversion cause of action went to the jury and resulted in a verdict for Paiman.  The record does not reveal the outcome of the remaining causes of action.

Mark A. Serlin, the attorney who filed the lawsuit on behalf of Brasher's, stated the basis for the lawsuit in his declaration in support of the anti-SLAPP motion:  "As reflected in Brasher's books and records, Luxury had borrowed millions of dollars on a flooring line and had failed to repay Brasher's.  Moreover, it was evident that dozens and dozens of vehicles were sold 'out of trust' by Luxury at the direction of the Rahbarian family.  In a nutshell, when a dealer sells a vehicle and fails to pay the flooring lender with the sales proceeds, that is selling out of trust.  I was also advised that when my client went out to Luxury's lot to pick [up] my client's collateral, the Rahbarians refused to allow any of the vehicles to be taken and only when the police intervened was my client able to retrieve a certain number of cars.  However, my client advised me that numerous cars simply disappeared from the lots and were never recovered."  Serlin continued: "When I sought a receiver to take possession of my client's collateral, the Rahbarians caused Luxury to file for bankruptcy protection in the Bankruptcy Court for the Eastern [D]istrict of California.  Based on bank records I obtained by way of subpoena, it was evident that immediately before the bankruptcy filing, the Rahbarians had taken out hundreds of thousands of dollars in cash from Luxury to pay themselves and/or their own personal bills while owing millions of dollars to my client.  Significant monies were paid

4

in the few weeks before the bankruptcy to [Paiman], [Shayan], Vera Davydenko, and Alicia Cordona."**3**

Serlin further stated: "During the course of the [underlying case], I reviewed hundreds of pages of documents and took numerous depositions. I also had numerous conversations with counsel for [Shayan] and [Paiman] during the course of the case. During the course of the case, through such conversations and discovery, I learned that, among other things, [Paiman] originally had a dealer's license and operated, along with his father [Mike], a dealership called Cars 4 Less. My client had loaned money to Cars 4 Less some years ago and when [Paiman] lost his dealer's license . . . the dealership had to be reconfigured and the Rahbarians set up Luxury with [Shayan] as the president. [Shayan], by his own testimony, had and has mental problems . . . and he acted essentially as a figurehead president of Luxury while [Paiman] effectively ran the business. Indeed, there was considerable evidence that [Paiman] was the one who continued to attend most of the auctions to buy cars for Luxury and [Paiman] was the one who delivered payment to Brasher's for cars for which titles were needed." Serlin continued: "I also learned during the course of the litigation that a number of brand new Suzukis which had been floor financed by Brasher's had been removed from Luxury's lots right about the time that Brasher's sought to pick up its collateral. These Suzukis and

---

**3** Brasher's requests that we take judicial notice of bankruptcy judgments entered in favor of Brasher's for these fraudulent transfers. We do so. (Evid. Code, §§ 452, subd. (c), 459; see *Java Oil Ltd. v. Sullivan* (2008) 168 Cal.App.4th 1178, 1181, fn. 1.) Judgment in the amount of $294,150 was entered against Paiman. Judgment in the amount of $308,150 was entered against Shayan. Judgment in the amount of $80,250 was entered against Davydenko. Judgment in the amount of $200,000 was entered against Cordona. Brasher's also requests that we take judicial notice of the memorandum of points and authorities in support of the anti-SLAPP motion that was listed in the designation of record on appeal, but inadvertently omitted from the clerk's transcript. We treat this request as a motion to augment the record and grant the motion.

other vehicles constituting Brasher's collateral were found by a state court appointed receiver in a warehouse on 16th [S]treet in Sacramento. Subsequently, the warehouse was broken into and all of the cars were taken. The receiver subsequently found out that the property had been broken into and the cars had been taken by [Paiman]. Indeed, this was the receiver's testimony at trial."

As mentioned, the fraud cause of action against Paiman was voluntarily dismissed during trial and the conversion cause of action went to the jury and resulted in a verdict for Paiman.

### The Present Lawsuit

In June 2010, Paiman, Shayan, Davydenko, and Cordona filed a lawsuit against Brasher's and John E. Brasher (president of Brasher's) that included a cause of action for malicious prosecution. The complaint was not made a part of the record on appeal. Nevertheless, we accept Paiman's statement in his opening brief that the malicious prosecution cause of action was "based on the favorable termination of [the underlying] conversion and fraud [causes of action] filed against [Paiman] by Brasher's." Serlin added in his declaration in support of the anti-SLAPP motion that the malicious prosecution cause of action alleged these underlying claims against Paiman were "brought 'without probable cause' and that Brasher's conduct was 'willful, wanton, malicious and . . . with an evil motive and intent and a reckless disregard for the rights and safety of [Paiman].' "

### The Anti-SLAPP Motion

In February 2011, Brasher's filed an anti-SLAPP motion seeking to strike the malicious prosecution cause of action. In support of the motion, Brasher's argued: (1) the malicious prosecution cause of action arises from protected activity; and (2) Paiman cannot show a probability of prevailing on the cause of action because he "cannot show that Brasher's initiated and prosecuted the [underlying lawsuit] without a

6

probable cause, much less that Brasher's initiated this case with malice." As mentioned, attached to the motion was Serlin's declaration, which provided the basis for the claims made against Paiman. Attached to Serlin's declaration were the underlying complaint, promissory note, flooring agreement, personal guarantees, security agreement, deed of trust, and the modification to the deed of trust.

John E. Brasher also submitted a declaration in support of the motion. The declaration stated: "Brasher's was asked by the Rahbarians to provide floor financing to a new dealership by the name of [Luxury]. I was told by Paiman that his brother, Shayan, would nominally be the president of Luxury but that he (Paiman) would still effectively [be] operating the dealership. Based on the existing relationship that Brasher's had with Paiman, this was acceptable. Bra[s]her's agreed to provide floor financing for about 3 million dollars to Luxury. [¶] . . . Luxury then obtained a Suzuki dealership and Luxury asked Brasher's to provide floor financing for brand new Suzukis. Brasher's agreed to provide such financing. [¶] . . . At some point in time, Brasher's became aware that Luxury was not paying of[f] vehicles that had been financed by Brasher's within terms. The normal terms for payoff when a vehicle [is] sold was that Brasher's had to be paid within a matter of days. When it became clear that this was not occurring and that cars were being sold without payment (in industry parlance, this is called selling cars 'out of trust'), I began making demands that the arrearage be caught up and that Luxury stop selling cars out of trust. This would have been in the latter part of 2006. Paiman told me that he understood the problem and that he was going to make things better."

The declaration continued: "In the early part of 2007, things were not getting better and cars were still being sold out of trust despite numerous promises to the contrary. In the Spring of 2007, I had numerous conversations with Paiman and Shayan about catching up on the arrears and their indebtedness, which at the time was around 4 million dollars. Finally, after negotiations broke down in late May/early June of 2007, I

and other employees of Brasher's went out to Luxury's lots to repossess our collateral, which consisted of the entire vehicle inventory. Much to my shock and horror, I literally watched my collateral being driven away in front of my eyes. When I confronted Paiman about where the cars were going, he denied any knowledge of it and blamed Shayan. When I confronted Shayan about it, he blamed Paiman. Only after the police intervened was Brasher's able to recover a certain number of vehicles, but dozens of vehicles which were on Luxury's lots and by all appearances were Brasher's collateral simply disappeared."

The declaration concluded: "[B]ut for the advice of counsel, and in reliance thereon, Brasher's would not have initiated and prosecuted the [underlying lawsuit] against Luxury, Paiman and Shayan. At no time did either I or anyone else at Brasher's have any intent to harass any of the defendants nor did we bear any malice or any ill will to any of the defendants. The sole purpose in bringing the [underlying lawsuit] was to recover monies duly owed to Brasher's."

### Opposition to the Motion

On July 14, 2011, Paiman filed an opposition to the motion.[4] Paiman conceded the malicious prosecution cause of action arises from protected activity within the meaning of the anti-SLAPP statute. With respect to his probability of prevailing on the merits, Paiman pointed out there was no dispute concerning the fact Brasher's initiated the underlying lawsuit and argued it "was pursued to a legal termination in Paiman's favor as the jury returned a verdict by a 7 to 1 vote in favor of Paiman and against Brasher's." As mentioned, this is true with respect to the conversion cause of action.

---

[4] In the meantime, Paiman sought and obtained an order allowing limited discovery regarding John E. Brasher's reliance on advice of counsel in filing the underlying lawsuit. Thereafter, in June 2011, Paiman's attorney took the depositions of John E. Brasher and Serlin.

8

However, the fraud cause of action was voluntarily dismissed and Paiman offered no argument regarding whether this amounted to a favorable termination of that cause of action.

With respect to whether the underlying lawsuit was brought without probable cause, Paiman also confined his argument to the conversion cause of action, describing this cause of action as one for "conversion of certain vehicles that Brasher's had 'floored' with [Luxury]." Paiman argued: "The declarations of [Davydenko] and [Shayan] submitted in support of this opposition conclusively prove that an accounting of the vehicles had been taken on June 15, 2007 in the presence of John E. Brasher, and that John E. Brasher was satisfied with the accounting. The declarations of [Davydenko] and [Shayan] state that as a result of the accounting of the vehicles taken on June 15, 2007 in the presence of John E. Brasher, all of the vehicles financed and floored by Brasher's had been accounted for and there was not a single vehicle missing that had been financed and floored by Brasher's. [¶] Thus, no reasonable attorney would find Brasher's claim for conversion tenable if he knew that an accounting had been taken and that all of Brasher's vehicles had been accounted for to the satisfaction of John E. Brasher on June 15, 2007, well before Paiman was added as a defendant in the Amended Complaint filed on December 14, 2007." The aforementioned declarations were attached to the opposition and stated such an accounting had taken place.

Paiman also argued Brasher's could not rely on an advice of counsel defense because John E. Brasher did not reveal the accounting to Serlin and further lied to Serlin regarding Paiman's purported statement it was Shayan's idea to move cars off of Luxury's lot. Paiman submitted his own declaration stating John E. Brasher "never asked [him] that day 'why are you moving cars?' " and he never responded "that it was Shayan's idea." Paiman further argued the cars found in the warehouse had not been

9

floor financed by Brasher's and submitted a declaration from his attorney stating these cars were "sold by Luxury to Pay Less Car Rental, Inc.[5] shortly before June 15, 2007."

Finally, Paiman argued there was "ample circumstantial evidence" of malice on the part of Brasher's. In support of this argument, Paiman relied on his declaration, stating John E. Brasher "became very upset" when Paiman refused his request that Paiman sign a personal guarantee for Luxury's obligations to Brasher's, and that "Brasher's and [Serlin] made a false complaint to the California Department of Motor Vehicles that [Paiman] had removed, secreted or converted 192 vehicles that Brasher's had financed and floored with Luxury," which resulted in Paiman being "arrested and prosecuted for criminal charges by the California Attorney General's Office," which were ultimately dismissed. Paiman also argued Brasher's malice could be inferred from the fact John E. Brasher was satisfied with the accounting done on June 15, 2007, and nevertheless filed a conversion claim against Paiman.

### *Reply to the Opposition*

On July 20, 2011, Brasher's filed a reply to Paiman's opposition. With respect to the issue of whether the conversion cause of action was brought without probable cause, Brasher's argued: "[T]he Rahbarians have not even begun to contradict any of the fundamental points made in the declarations of [Serlin] and John Brasher in support of the anti-SLAPP motion. They do not dispute that millions of dollars worth of vehicles floor financed by Brasher's were sold out of trust, that dozens of vehicles were moved from the [Luxury] lots while Brasher's was attempting to repossess its collateral, that their own manager, Kamyar Soltani, told John Brasher that the Rahbarians were actively

---

[5]     Cars 4 Less, Inc., apparently did business under the name Payless Car Rental.

10

concealing Brasher's collateral to avoid repossession,[6] that Paiman was the de facto operator of [Luxury], that the Rahbarians paid hundreds of thousands of dollars of vehicle sales proceeds to themselves at about the time Brasher's sought to repossess its collateral, that [Paiman] actively concealed at least 16 new Suzukis which had been floor financed by Brasher's and for which Brasher's had not been paid, and that [Paiman] broke into a warehouse subject to a receivership to take and further conceal those Suzuki vehicles."

Brasher's argued the "red herring" of the June 15, 2007, accounting did not negate liability for conversion because "Brasher's had a blanket security interest in all of the vehicles owned by Luxury, not merely the ones that Brasher's had specifically financed. Brasher's submitted evidence, none of which has been contradicted by Paiman, that dozens of cars were literally leaving the Luxury lot in front of [John] Brasher's eyes on June 15, 2007. Moreover, many of those cars were brand new Suzukis which had been floor financed by Brasher's. Paiman asserts that a number of said vehicles had been transferred by Luxury to the Rahbarian affiliate Cars [4] Less a day or so before Brasher's came to repossess its vehicles in June of 2007. This is, ironically, further proof that the conversion actually occurred. Notably, Paiman does not contend, because he knows it would be false, that Cars 4 Less actually paid for the vehicles transferred by Luxury, much less that any proceeds of such payments were ever paid to Brasher's as required by the floor financing contract and by law. The reason is obvious; neither is true."

---

**6** John E. Brasher testified in his deposition that when he was at Luxury on June 15, 2007, as negotiations were breaking down and cars were being removed from the lot, Soltani walked to the other side of the Luxury building, called Brasher on his cell phone, and said Paiman and Shayan were also moving cars from other lots.

11

### *The Trial Court's Ruling*

The trial court granted the anti-SLAPP motion, finding no probability Paiman would be able to demonstrate Brasher's lacked probable cause in bringing the underlying conversion claim. After summarizing the evidentiary submissions and arguments recounted above, the trial court explained: "[E]ven if [Paiman's] evidence is believed by the trier of fact, it is insufficient to show the likelihood that [he] will succeed on this malicious prosecution claim. Even without the disputed matters identified by [Paiman], [the] evidence [submitted by Brasher's] is more than sufficient to establish probable cause as [a] matter of law under the standard set by [*Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430]."

## DISCUSSION

## I

### *The Anti-SLAPP Statute*

Section 425.16 provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) "[I]n applying the statute a court generally is required to engage in a two-step process: 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712, quoting *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)

Here, as mentioned, Paiman concedes the malicious prosecution cause of action arises from protected activity within the meaning of the anti-SLAPP statute. Accordingly, we shall address only the second stage of the anti-SLAPP analysis. We decide this stage of the analysis "on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).) Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.' [Citation.]" (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989.) This is because the anti-SLAPP statute does not require the plaintiff " 'to *prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim." (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 105.) " 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' . . . If the plaintiff 'can show a probability of prevailing on any part of its claim, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff has established that its cause of action has some merit and the entire cause of action stands.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820, italics omitted.)

We review the trial court's ruling de novo. (*Mendoza v. Wichmann*, *supra*, 194 Cal.App.4th at p. 1447.) Applying our independent judgment, we conclude Paiman has not demonstrated a probability of prevailing on his malicious prosecution claim. We turn to this analysis now.

## II

### *Probability of Prevailing on the Malicious Prosecution Claim*

The trial court ruled Paiman did not demonstrate a probability of prevailing on his malicious prosecution claim because Brasher's, as a matter of law, had probable cause to pursue the underlying conversion claim against him. We agree.[7]

"To establish a cause of action for malicious prosecution, a plaintiff must prove that the underlying action was (1) terminated in the plaintiff's favor, (2) prosecuted without probable cause, and (3) initiated with malice. [Citation.] A claim for malicious prosecution need not be addressed to an entire lawsuit; it may, as in this case, be based upon only some of the causes of action alleged in the underlying lawsuit. [Citations.]" (*Silas v. Arden* (2012) 213 Cal.App.4th 75, 89-90; *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.)

"The question of probable cause is 'whether, as an objective matter, the prior action was legally tenable or not.' [Citation.] 'A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to

---

**7** As a preliminary matter, we note the malicious prosecution claim was addressed to the conversion and fraud causes of action brought by Brasher's against Paiman. However, as also mentioned, Paiman did not argue before the trial court that the voluntary dismissal of the fraud cause of action amounted to favorable termination of that cause of action. Nor did Paiman argue before the trial court he would be able to prove Brasher's lacked probable cause to pursue the fraud cause of action. Instead, his arguments were confined to the conversion cause of action. With the issue so framed, the trial court did not address the fraud cause of action in ruling on the anti-SLAPP motion. Paiman's arguments on appeal regarding favorable termination and probable cause are also confined to the conversion cause of action. Thus, any argument that the trial court erred by granting the anti-SLAPP motion based on Paiman's likelihood of prevailing on the portion of his malicious prosecution claim directed to the underlying fraud cause of action has been forfeited.

14

him.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292.) "Probable cause 'is " 'a suspicion founded upon circumstances sufficiently strong to warrant a reasonable [person] in the belief that the charge is true.' " [Citations.]' " (*Mendoza v. Wichmann*, *supra*, 194 Cal.App.4th at p. 1449, quoting *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 55.) This "low threshold" is "designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. '[T]he standard of probable cause to bring a civil suit [is] equivalent to that for determining the frivolousness of an appeal [citation], i.e., probable cause exists if "any reasonable attorney would have thought the claim tenable." [Citation.] . . . Only those actions that " 'any reasonable attorney would agree [are] totally and completely without merit' " may form the basis for a malicious prosecution suit. [Citation.]' " (*Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1047-1048, quoting *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817.)

"The existence or absence of probable cause is a question of law to be determined by the court from the facts established in the case." (*Silas v. Arden*, *supra*, 213 Cal.App.4th at p. 90.) However, "[i]f there is a dispute as to such facts, that dispute must be resolved by the trier of fact before the objective standard can be applied by the court." (*Mendoza v. Wichmann*, *supra*, 194 Cal.App.4th at p. 1450.)

Paiman argues, as he did below, that "[t]he declarations of [Davydenko] and [Shayan] state that as a result of the accounting of the vehicles taken on June 15, 2007 in the presence of John E. Brasher, all of the vehicles financed and floored by Brasher's had been accounted for and there was not a single vehicle missing that had been financed and floored by Brasher's. [¶] Thus, no reasonable attorney would find Brasher's claim for conversion tenable if he knew that an accounting had been taken and that all of Brasher's vehicles had been accounted for to the satisfaction of John E. Brasher on June 15, 2007, well before Paiman was added as a defendant in the Amended Complaint filed on

15

December 14, 2007.  In other words, John E. Brasher knew as of June 15, 2007 that there were no vehicles missing for [Paiman] to have converted."  This argument misunderstands the law of conversion.

The tort of conversion has been described as " 'the wrongful exercise of dominion over the property of another.' "  (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451.)  However, "[n]either legal title nor absolute ownership of the property is necessary" to bring a cause of action for conversion.  (*Id*. at p. 452.)  "The elements of a conversion [cause of action] are the plaintiff's ownership or *right to possession of the property* at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages.  It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his [or her] own use."  (*Oakdale Village Group v. Fong* (1996) 43 Cal.App.4th 539, 543-544, italics added.)  Under these principles, "[o]ne who wrongfully withholds personal property from another who is entitled to it under a security agreement may be liable for conversion."  (*Messerall v. Fulwider* (1988) 199 Cal.App.3d 1324, 1329.)

Here, the security agreement gave Brasher's the immediate right to possession of *all* vehicles on the Luxury lot upon Luxury's breach of the promissory note and flooring agreement.  Paiman does not dispute that Luxury breached these agreements by selling cars out of trust.  Nor does Paiman dispute John E. Brasher's statement in his declaration that cars were being moved from the Luxury lot when Brasher's attempted to repossess these vehicles.  These undisputed facts would have led a reasonable attorney to believe a conversion of collateral had taken place.  The declarations submitted in opposition to the anti-SLAPP motion dispute whether these vehicles were floor financed by Brasher's, but this dispute is immaterial since Brasher's was entitled to possession of all vehicles on the Luxury lot under the terms of the security agreement.  Paiman also disputes that the

16

vehicles found in, and later removed from, the warehouse on 16th Street were floor financed by Brasher's.  Again, whether these cars were floor financed by Brasher's or not is immaterial.  John E. Brasher stated in his deposition he witnessed brand new Suzukis moving off of the Luxury lot the day Brasher's attempted to repossess its collateral.  This statement is not disputed.  The fact brand new Suzukis were found in a warehouse, and later removed from this warehouse by Paiman despite the fact a receiver had taken possession of the vehicles and changed the locks on the warehouse, provided strong reason for John E. Brasher and Serlin to suspect (1) these vehicles were the same Suzukis previously removed from the Luxury lot, and (2) Paiman was involved in their removal.

Paiman further disputes his personal liability for conversion since he did not personally drive any of the vehicles off the Luxury lot.  His declaration also states he "never had an official position or title with [Luxury], although [he] would go to [Brasher's] to bid on and purchase vehicles for Luxury" and "invested a considerable amount of money in Luxury."  However, for our purposes, the question is not whether Paiman should have been found personally liable for conversion in the underlying action, but instead whether there was a sufficiently strong reason for John E. Brasher and Serlin to suspect Paiman could be found personally liable for conversion.  (See *Mendoza v. Wichmann*, *supra*, 194 Cal.App.4th at p. 1449.)  On this point, Paiman does not dispute the statement in John E. Brasher's declaration that Paiman held himself out to be the actual operator of Luxury despite the fact Shayan was nominally the company's president.  Based on this undisputed statement, we have no difficulty concluding, as a matter of law, John E. Brasher and Serlin had sufficient reason to suspect Paiman was responsible for the removal of vehicles from Luxury's lot.

In sum, because the underlying conversion claim brought by Brasher's against Paiman was objectively tenable as a matter of law, Paiman has failed to establish a

17

likelihood of prevailing on his malicious prosecution claim.  Thus, the anti-SLAPP motion was properly granted.

## DISPOSITION

The trial court's order granting the anti-SLAPP motion is affirmed.  Costs on appeal are awarded to Brasher's Sacramento Auto Auction, Inc., et al.  (Cal. Rules of Court, rule 8.278(a).)


      HOCH    , J.


We concur:


     HULL    , Acting P. J.


     ROBIE    , J.