Filed 1/5/24  Marriage of Heriberto R. and Katrina R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re the Marriage of HERIBERTO and KATRINA R. | |
| HERIBERTO R., JR., | E078865 |
| Appellant, | (Super. Ct. No. FLRI2004664) |
| v. | OPINION |
| KATRINA ELIZABETH R., | |
| Respondent. | |

APPEAL from the Superior Court of Riverside County.  Wendy Harris,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Law Office of Lauren Laundis and Lauren Laundis, for Appellant.

No appearance for Respondent.

1

## I.

## INTRODUCTION

In this marriage dissolution case, Heriberto R. appeals the family court's order awarding his ex-wife, Katrina R., sole legal and physical custody of their three minor children.[1] We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2020, the family court entered a Domestic Violence Restraining Order (DVRO) against Heriberto while denying his request for a DVRO against Katrina. We affirmed those orders in a nonpublished opinion in October 2022. (See *Katrina R. v. Heriberto R.* (Oct. 18, 2022, E075915) [nonpub. opn.].)[2]

Among other things, the DVRO ordered Heriberto to sell or store his five firearms with a licensed gun dealer or turn them into law enforcement. Heriberto agreed to transfer the firearms to a dealer and then have them sold. Heriberto was given 24 hours to comply with the order and 48 hours to provide proof of his compliance. The DVRO also awarded Katrina the family residence in Banning and sole custody of the parties' four then-minor children, K., S., E., and M.

---

[1] Because this case involves the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.) and the parties' minor children, we refer to the parties by first name and last initial to protect their privacy and their children's privacy. (Cal. Rules of Court, rule 8.90(b)(1).)

[2] We take judicial notice of this opinion. (Evid. Code, § 452, subd. (d)(1); *Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430, 1433, fn. 2.)

A few months later, however, Heriberto petitioned for a change in custody because Katrina allegedly abused the children. The family court ordered the Riverside Department of Social Services (the Department) to conduct an investigation into the allegations and prepare a report under Family Code section 3027, subdivision (b).[3] The family court later granted Heriberto's petition and changed the custody order so that the parties had joint legal custody of the children, with physical custody to Heriberto and eight hours of supervised visits per week to Katrina.

In February 2022, the family court held a 7.5-hour bench trial over four days to resolve Heriberto's petition to dissolve his marriage to Katrina. The parties and M. testified, as did the children's therapist, Alysa Johnson, and Angel Vandhana, a court-ordered supervisor of Katrina's visits with the children.

M. testified at length about Katrina's repeated physical abuse of her and her siblings. According to M., Katrina "rage hit[]" the children's thighs and buttocks. "[T]he spanking goes from the lower back all the way from the butt to the thighs, the back of the thighs." M. and K., the two oldest of the parties' children, were not allowed in their younger siblings' room "to stop Katrina from spanking E[.]" on one occasion because M. and K. had previously called the police when Katrina spanked E. M. claimed that she and K. had intervened to stop Katrina's "rage-filled" spanking of E. five times and had

_____

[3] That provision states, "If allegations of child abuse, including child sexual abuse, are made during a child custody proceeding, the court may request that the local child welfare services agency conduct an investigation of the allegations." Although the Department of Social Services' report was admitted into evidence at trial, it is not in the record on appeal.

called the police each time, but she could not recall how many times the police came to the house.

When the incident prompting the Family Code section 3027 investigation occurred, M. and K. were in the hallway, but M. could hear Katrina hitting E., who screamed repeatedly, "Mommy stop. Stop. That hurts. Ow!" M. testified that S. kept telling Katrina to stop hitting E., but Katrina threatened to push S. off of the top bunk or to push her down the stairs if S. did not stop interfering. M. testified that she and her siblings called the police multiple times because of Katrina's abuse.

Katrina did not deny that she had spanked E. "on her behind," but she denied ever hitting her "over and over again." She claimed she had only spanked E. on her bottom. Katrina also did not deny that S. tried to intervene when Katrina "tried spanking E[.] on her behind because she was kicking me and trying to hit me and screaming," and acknowledged that M. recorded the incident on her phone.

Later that day, Katrina cleaned a scratch on E.'s leg. Katrina denied she caused the scratch. When cleaning the scratch, E. yelled repeatedly, "It burns." Katrina admitted that she responded, "Next time I tell you to stop talking back and to listen, maybe if you weren't kicking me and throwing arms around, you wouldn't have hurt yourself." She also admitted that she "probably" said to E., "Go ahead. Talk back. I'm going to smack you again. Keep talking back. I'm done with you talking back disrespectfully and screaming at me. Not happening." Katrina denied, however, that she

4

threatened to kick E. in the face or that S. told Katrina that she had hit E. several times and "that is enough."

Johnson testified that she had been the children's therapist since December 2020 and had seen them weekly. Johnson talked with the children a few weeks before trial and they all told her that they did not want to see Katrina. In Johnson's view, the children never reported any "substantial" positive relationship with Katrina.

According to Johnson, K. had "severe anxiety" about seeing Katrina and "made it clear that she just did not want to see her mother" when they met before trial. K. had previously told Johnson about Katrina's abuse. Specifically, Katrina had "shoved" and "pushed" K., and had seen Katrina "go after" E., which prompted K. to "sort of stand in the way and guard and try to pull the attention to her."

During their meeting before trial, E. had "some anxiety" about talking to and seeing Katrina. Johnson explained that E. had previously reported that Katrina had hit her and that E. "remembers the pushing and the screaming and the yelling."

S. told Johnson she did not want to see Katrina during their meeting before trial, but did not say why. Johnson opined, however, that S. suffered from post-traumatic stress disorder stemming from Katrina's abuse of the children. S. had seen Katrina "hitting E[.] and hitting her sisters, pushing them out of the way," during "multiple events." S. had recurring "bad dreams about her mom leaving her by herself" because Katrina "regularly" left the children at home alone.

As for M., she reported witnessing "similar abuse" to Johnson.  She saw Katrina hit, push, and shove E. and K.

The children also reported to Johnson that none of them were interested in joint therapy with Katrina.  K. did not want to do it because she did not want to reunify with Katrina, but S. and E. did not explain why they were against it.

Johnson also testified that the children reported that Heriberto had never abused them and there was no indication that he spoke "negatively" to the children about their mother.  Johnson also was not aware of anything suggesting that Heriberto had influenced E. and S.'s into saying that they were unsure about whether they wanted to reunify with Katrina.

Vandhana testified generally about Katrina's supervised visits with the children. Katrina did not visit the children between April 2021 and December 2021.  In Vandhana's view, however, if one of the children did not want to do a visit, then "the others usually kind of follow suit most of the time."

In January 2022, about a month before trial, Heriberto drove the children to the drop-off location, but they refused to get out.  As a result, the visit did not happen.

Vandhana had to terminate an April 2021 visit because none of the children wanted to visit Katrina.  K. "never wanted to participate in a visit."  M., then a minor, also never wanted to participate either.  E. and S. eventually agreed to the visit, but Vandhana terminated the visit after S. got into a "verbal altercation" with Katrina.  S. said to Katrina, "Why are you trying to attempt at visitation? . . . You don't care about us.  I

6

don't think you want us in your life. And we wouldn't even be in this situation where we're on visits if you hadn't done what you did." Vandhana repeatedly told Katrina that the visit was terminated and that Katrina had to leave because the children were upset and Vandhana did not want to "have them traumatized." M. eventually said, "The visit is over," grabbed E. and S.'s hands, and walked away.

Heriberto testified on the first day of trial. He testified about his firearms, among other things. He said that his firearms were in the Banning residence when he left the home. He explained that he could not comply with the DVRO's order to relinquish the firearms because they were in the Banning residence, which he could not enter. He claimed that he tried to get the Banning police department and registered firearms dealers to pick up the guns, but no one agreed to do so.

At the end of the second day of trial, the family court sua sponte ordered temporary sole legal and physical custody of the children to Katrina. The family court explained that it was making that order because Heriberto testified the day before that he had not yet surrendered his firearms. Heriberto's counsel objected and asked to make a record, stating that Heriberto could not turn over the firearms because they were at Katrina's residence (the Banning family home). The family court refused the request on the ground it did not need any further information from Heriberto's counsel.

When trial began the next day, Heriberto's counsel began by discussing the firearms issue. She explained that she had lodged transcripts from the initial DVRO hearing, which was held by a different judicial officer. According to counsel, that judge

7

ordered Katrina to turn over the firearms to the police because they were at the Banning house, which was in her exclusive possession. Counsel then argued that the family court should not have sua sponte changed the custody order because Katrina had not requested the change and there was no imminent harm to the children. Without addressing either issue further, the family court asked Katrina to take the stand for cross-examination.

After the trial concluded, the family court issued a lengthy oral ruling. As relevant here, the court explained in detail its many reasons as to why it was awarding sole legal and physical custody of K., S., and E. to Katrina with no visitation to Heriberto.[4]

The first reason was that Heriberto continually violated the August 2020 DVRO's order to turn in his firearms and had not done so by February 15, 2022, the last day of trial.[5] The court found his testimony on this issue "contradictory" because he argued Katrina was required to relinquish the firearms but later claimed he unsuccessfully tried to contact law enforcement and firearms dealers to turn in the weapons. The court also did not find credible his testimony that he contacted law enforcement to pick up the weapons but they declined to do so. The court doubted that he was ever "forthright with

---

[4] M. turned 18 before trial, so she was not subject to custody orders.

[5] The family court stated that Heriberto violated a supplemental order issued on the second day of trial, February 9, 2022, to relinquish his firearms. Although the court's February 9 order states that Heriberto had not complied with the previous order to relinquish his firearm arms and that the court would notify law enforcement and the District Attorney within 48 hours to apprise them of Heriberto's noncompliance, the court did not re-order Heriberto on February 9 to make efforts to relinquish his firearms.

anyone" who could lawfully retrieve his firearms. The court observed that Heriberto never filed a DV-800 form outlining his efforts to relinquish his firearms.

The family court then explained that, because of the DVRO, it was applying Family Code section 3044 (section 3044) against Heriberto, which imposes "a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child."

The next reason for the court's custody order was that "there is an active criminal protective order." But "[t]here was no evidence presented . . . as to the status of that matter, what the charges are, what is the likely outcome," because there was no evidence in the record about the charges.

Another reason was that Heriberto had violated a court order not to sell the parties' property by selling a vehicle.

The court's next reason for its custody order was that Heriberto "violated a court order by changing the children's school without [Katrina's] authorization." The court also found that Heriberto violated a court order to enroll in and complete a 52-week "batterer's program," but that he had complied by the time of trial.

The next reason for the family court's custody order concerned Heriberto's refusal to give Katrina his address. The court found that an agreement to share one another's address is implicit in every joint legal custody order so that both parents know where their children live. During the first day of trial, however, Katrina testified that she still

9

did not know Heriberto's address. It appeared to the court that Heriberto was "thinking of moving away, and [Katrina] has no idea of this, nor does the Court."

The court then explained that another reason for its custody order was that "[i]t's clear that [Heriberto is] not in a position to co-parent." The court reached this conclusion in part after reviewing "67 pages" of TalkingParents messages between the parties showing that Heriberto was responsible for about 5 percent of the messages because he would "take three or four days to look at it, never respond, page after page after page." The court quoted the following message from Katrina as an example: "I don't have any money. We can't pay for monitoring. Can we think of a third party that we don't have to pay? I need to see my kids. I'm borrowing money to see my kids. Let's work something out." The court described Heriberto's response as: "Nothing. Ghost town. It's clear he has an agenda. It's clear he's not in a position to co-parent."

After issuing its ruling, the court explained that Heriberto could later petition to change the custody order if he successfully complied with the court's orders.

When issuing its ruling, the family court also explained its custody-related orders to Katrina. The court told Katrina that the children "have problems with you. I know you know it, and I know you need to work on it." The court acknowledged that Katrina's anxiety negatively affected her parenting, implored her to "get that into control," and strongly suggested therapy while ordering her to enroll the children in therapy. In the court's view, her anxiety was a main reason why the children did not want to live with her.

The court then noted that the event that led to the Department's Family Code section 3027 report was an incident that Katrina called "discipline" while the children "call[ed] it beating up. Whatever." The court ordered Katrina (and Heriberto) not to "lay their hand on any of these children," stating that "spanking them is not going to be an effective means of discipline." Given Katrina's anxiety and use of corporal punishment, the court ordered her to take "a parenting class geared towards teenaged adolescents, honing in on effective discipline techniques so that we don't have you yelling and screaming and putting your hands on the children."

The family court concluded its oral ruling by outlining the reasons why it had considered sanctioning Heriberto's attorney. One reason was for counsel filing a request for sanctions under Family Code section 271 that the court found frivolous (and thus denied). The court noted found that Heriberto's counsel's "candor . . . is suspect, and has been, quite frankly, the entire duration of this case." As examples of the court's concerns, the court stated that Heriberto's counsel cited nonexistent or inapplicable authority, provided an unsigned off-work order from her doctor on the first day of trial, yet issued subpoenas to Katrina in violation of the off-work order. The court, however, declined to sanction Heriberto's counsel and concluded its ruling. Heriberto timely appealed.

11

DISCUSSION

Heriberto challenges only the family court's order awarding permanent sole physical and legal custody of the children to Katrina while awarding him no visitation. He argues the family court erred in five respects: (1) the family court lacked jurisdiction to award Katrina custody while his appeal of the DVRO was pending, (2) the court erroneously awarded Katrina custody based on his violation of the order to relinquish his firearms, which were in Katrina's custody and control, (3) the family court refused to hear evidence that the firearms were in Katrina's custody and control, (4) the family court erroneously awarded Katrina custody sua sponte in the middle of trial without any showing of a threat of immediate harm to the children, and (5) the family court's evidentiary rulings unconstitutionally precluded him from presenting his case. We reject Heriberto's contentions and affirm the family court's custody orders.

A. *Jurisdiction*

The family court issued its DVRO in August 2020 and Heriberto timely appealed the order in October 2020. We issued our opinion affirming the order in October 2022, so the April 2022 trial in this case was held while Heriberto's appeal was pending.

The filing of an appeal generally "stays proceedings in the family court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order . . . ." (Code Civ. Proc., § 916, subd. (a).) An exception to this rule is in Code of Civil Procedure section 917.7, which

provides that the filing of an appeal "shall not stay proceedings as to those provisions of a judgment or order which award, change, *or otherwise affect the custody* . . . of a minor child in any civil action."  (Code Civ. Proc. § 917.7, italics added.)  Instead, an order affecting child custody or visitation is stayed on appeal only if the family court orders a stay.  (Code Civ. Proc. § 917.7.)  Unless the family court grants a stay, the court retains jurisdiction to modify any order affecting child custody or visitation during the pendency of an appeal.  (Code Civ. Proc. § 917.7.)

The DVRO temporarily awarded Katrina sole legal and physical custody of the children.  Thus, under Code of Civil Procedure section 917.7, the family court had original jurisdiction to render a final custody order, regardless of Heriberto's appeal of the DVRO.  (See *Mancini v. Superior Court* (1964) 230 Cal.App.2d 547, 554 ["[T]he trial court . . . in spite of the appeal [has] the discretionary power to make, vacate and modify custody orders."].)

B. *Section 3044 Presumption*

Heriberto contends the family court improperly applied section 3044's rebuttable presumption against him.  We find no error.

Section 3044 states in relevant part that when a court finds "that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child."  (§ 3044,

13

subd. (a).)  The presumption is mandatory and must be applied whenever a court has found that a party seeking custody has perpetrated domestic violence within five years. (*Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186, 196.)

To rebut the presumption, the perpetrator of domestic violence must show two things.  "First, the court must be satisfied that the award of custody is in the child's best interest.  [Citation.]  Second, the court must be satisfied that on balance, the six additional enumerated factors support an award of custody." (*Abdelqader v. Abraham*, *supra*, 76 Cal.App.5th at p. 196.)  As relevant here, those factors include that "[t]he perpetrator is restrained by a protective order or restraining order, and has or has not complied with its terms and conditions" and "[t]he court has determined, pursuant to [Family Code] [s]ection 6322.5, that the perpetrator is a restrained person in possession or control of a firearm or ammunition in violation of [s]ection 6389." (§ 3044, subd. (b)(2)(E), (G).)

Heriberto argues the family court improperly applied the presumption because the firearms were in Katrina's possession or control, not his.  We need not decide whether who controlled or possessed the firearms.  Even if Katrina possessed and controlled the firearms, Heriberto fails to show that the family court improperly applied the section 3044 presumption.

Because the family court found in August 2020 that Heriberto had perpetrated domestic violence against Katrina, section 3044's mandatory presumption applied. (§ 3044, subd. (a).)  To rebut that presumption, Heriberto first had to show that giving him custody of the children would be in their best interests, but he makes no attempt to

14

do so in his opening brief.[6]  (§ 3044, subd. (b).)  He has therefore failed to show that he

rebut section 3044's mandatory presumption.

Nor has Heriberto shown that the family court misapplied the factors at the second

step of the rebuttal analysis.  Even if Heriberto is not "a restrained person in possession

or control of a firearm or ammunition" (§ 3044, subd. (b)(2)(G)) and thus did not violate

the DVRO's firearm orders, the family court found that he had violated several court

orders, which is a factor the court had to consider.  (§ 3044, subd. (b)(2)(E).)  The family

court found that Heriberto violated the court's orders by (1) selling the parties' vehicle,

(2) changing the children's school without Katrina's authorization, and (3) failing to

timely file proof that he completed a batterer's program.  Heriberto ignores these findings

and, in turn, fails to show that the family court misapplied section 3044, subdivision

(b)(2)'s factors.  As a result, we conclude the family court properly applied section

3044's presumption against Heriberto.

C. *Precluding Evidence About the Firearms*

On separate occasions during trial, Heriberto asked to present evidence that the

firearms were not in his care, custody, or control and thus he could not comply with the

DVRO's requirement that he relinquish his firearms.  The family court, however,

precluded Heriberto from doing so each time.  Heriberto argues this violated his

---

[6]  Because Katrina did not file a respondent's brief, Heriberto did not file a reply brief.

15

constitutional right to rebut evidence and, in doing so, the family court imposed an irrebuttable presumption under section 3044.

We disagree. Again, Heriberto does not show, as he must, why granting him sole or joint custody would be in the children's best interests (§ 3044, subd. (b)(1)). Because he fails to make that threshold showing, we cannot find that the family court misapplied section 3044. (See *Abdelqader v. Abraham*, *supra*, 76 Cal.App.5th at p. 196 ["First, the court must be satisfied that the award of custody is in the child's best interest" before considering section 3044, subdivision (b)(2)'s six factors].)

In any event, we disagree with Heriberto that the family court imposed an irrebuttable presumption under section 3044 by refusing to hear further evidence that he had no access to the firearms because they were in Katrina's residence.

Although the August 2020 DVRO ordered Heriberto to relinquish five firearms, he had not done so by the time of trial in April 2022. He testified that he contacted law enforcement and licensed firearms dealers, but no one would retrieve the firearms, so there was nothing he could do. The family court not only found this testimony not credible, but also found that the DVRO ordered Heriberto to relinquish his firearms— regardless of where they were located—and that he violated that order.

The family court thus did not impose an irrebuttable presumption under section 3044 by precluding Heriberto's proffered evidence about the location of the firearms. Instead, the court ruled that irrespective of where the firearms were, Heriberto was obligated to ensure that he relinquished his firearms. Thus, the family court did not

16

impose an irrebuttable presumption under section 3044 but instead concluded that it did not need more evidence about the location of the firearms.

We need not decide whether that ruling was erroneous because it was harmless. Even if the family court had allowed Heriberto's proffered evidence, it is not reasonably likely that the court would have reached a different result. (See *People v. Jones* (2013) 57 Cal.4th 899, 957 [applying California standard to assess prejudice of excluded evidence because "the routine application of provisions of the state Evidence Code law does not implicate a defendant's constitutional rights"].)

To begin with Heriberto fails to show that awarding him custody of the children was in their best interests, so he cannot overcome section 3044's mandatory presumption against him. (See *Abdelqader v. Abraham*, *supra*, 76 Cal.App.5th at p. 196.) For that reason alone, any error in precluding Heriberto from presenting evidence about the firearms' location was harmless.

More to the point, the firearms issue was just one of many reasons why the family court awarded sole custody to Katrina. As outlined above, those reasons include (1) Heriberto's multiple violations of several other aspects of the DVRO, (2) his pending criminal case and resultant criminal protective order, (3) his inability to co-parent evidenced by the parties' text messages, and (4) his refusal to give Katrina his address. Heriberto makes no attempt to explain why it is reasonably probable that the family court likely would have reached a different conclusion had it allowed additional evidence about

17

Katrina's possession and control of his firearms.  Any error in excluding that evidence was therefore harmless.

   D. *Awarding Custody During Trial*

After the third day of trial, the family court sua sponte changed its custody order to award temporary sole and physical custody of the children to Katrina because Heriberto had not relinquished his firearms.  Heriberto argues doing so violated Family Code section 3064.  We disagree.

Family Code section 3064 provide in relevant part, "[t]he court shall refrain from making an order granting or modifying a custody order on an ex parte basis unless there has been a showing of immediate harm to the child or immediate risk that the child will be removed from the State of California.  [¶]  (b) 'Immediate harm to the child' includes, *but is not limited to*, the following:  [¶]  (1) Having a parent who has committed acts of domestic violence, where the court determines that the acts of domestic violence are of recent origin or are a part of a demonstrated and continuing pattern of acts of domestic violence . . . ."  (Italics added.)

Heriberto argues the family court violated Family Code section 3064 by sua sponte granting Katrina custody of the children because there was no threat of immediate harm to them.  However, there is "immediate harm" to a child when the custodial parent has committed acts of domestic violence and the acts are "of recent origin."  Heriberto was found to have committed acts of domestic violence against Katrina on April 28 and 30, 2020, less than two years before the trial.  Although the family court changed its

18

custody order because Heriberto had not relinquished his firearms in violation of the DVRO, the court also could have reasonably found that Heriberto had committed acts of domestic violence of recent origin such that the children were at risk of immediate harm under Family Code section 3064, subdivision (b)(1).  We, therefore, affirm the court's sua sponte change in its custody order on that basis.  (See *Love v. State Dept. of Education* (2018) 29 Cal.App.5th 980, 988 [appellate court may affirm "on any basis presented by the record whether or not relied upon by the trial court"].)

In any event, any error was harmless.  The family court issued its final, permanent custody order awarding Katrina sole custody of the children just a few days after temporarily awarding her custody.  So even if the family court erred by temporarily changing custody without a finding of immediate harm to the children, that error was quickly remedied by the court's subsequent custody order after trial.

E. *Preventing Heriberto from Presenting His Case*

Heriberto argues the family court repeatedly prevented him from presenting his case in violation of his due process rights.  He points to nine of the family court's evidentiary rulings, which we address in turn.

First, when Heriberto's counsel called M. to testify, the family court initially refused to her testify.  Counsel explained that she wanted M. to testify about Katrina's abuse of the children and to rebut her testimony about what occurred on the day that prompted the Family Code section 3027 report.  The court then ruled that M. could testify "as to that one day and one day only."  Heriberto's counsel did not object, and the court

reiterated its ruling that M. could testify only "about that . . . one and only incident."

Again, Heriberto's counsel did not object. Heriberto, therefore, forfeited any argument

that the family court improperly limited M.'s testimony. (See *People v. Woodruff* (2018)

5 Cal.5th 697, 769.)

M. testified about other incidents and Heriberto offers no explanation as to what

else M. would have testified about. On direct examination, M. testified that although she

was in the hallway on the day that prompted the Family Code section 3027 report, she

assumed Katrina was abusing E. in part because she knew Katrina "gets into her rage

hits, that the spanking goes from the lower back all the way from the butt to the thighs,

the back of the thighs." On cross-examination, M. testified that she had called the police

a few days before that incident because she tried to stop Katrina's "rage-filled hit[s] on

E[.]," and had called the police at least five times because of Katrina's abuse. Given this

testimony, it is not reasonably probable the family court would have ruled differently had

M.'s testimony not been circumscribed.

Second, Heriberto argues the family court erred by declining to hear evidence on

why he refused to give Katrina his address. We reject this argument because Heriberto

has provided no authority suggesting he was justified in not disclosing his address to

Katrina. In any event, he testified that he did not do so because Katrina once sent an

"aggressive" person to his house, and he offers no description of what other evidence on

the issue he intended to submit.

Third, Heriberto claims the family court erred by refusing to hear testimony from a Department supervisor about the status of the Family Code section 3027 report and whether the Department "closed that case." The court did so because "the report speaks for itself." The report is not in the record, however, so we cannot adequately assess Heriberto's argument and must resolve the issue against Heriberto. (See *569 E. County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 434, fn. 9.)

The fourth and fifth instances where the family court precluded Heriberto from presenting his case pertain to the court's refusal to consider evidence that he could not relinquish his firearms because they were in Katrina's possession and control. For the reasons outlined above, we again reject this argument.

Sixth, the family court denied Heriberto's request to have then-11-year-old S. testify. The court did so under Evidence Code section 352, finding that "it would be more detrimental to [S.]" and the court "would not garner any relevant information." Heriberto fails to show that this was an abuse of the family court's "wide discretion" under Evidence Code section 352. (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1366.) In fact, he does not acknowledge the reasons or legal basis for the court's ruling.

Seventh and eighth, the family court precluded S. and K. from testifying and instead asked Katrina a few questions about whether the children wanted to live with her. The court explained that did not let K. testify because the court was well into the fourth day of trial and knew "what she's going to say," which was "not going to serve" the

21

court.  Katrina then testified that the children did not want to live with her or go to therapy with her.

Although Heriberto contends these rulings prevented him from presenting his case, he fails to explain in any detail what S. and K. would have testified to, how their testimony would have added new evidence to the record, or how their testimony may have affected the family court's custody orders in Heriberto's favor.  So, even assuming the family court erred by excluding K.'s testimony, we discern no resulting prejudice.

The ninth and last evidentiary ruling Heriberto challenges is the family court's refusal on the fourth and last day of trial to hear testimony from Katrina on the "67 pages of texts between her and Heriberto."  The family court explained:  ""I have enough evidence on that issue as to their poor parenting and coparenting issues.  I don't need any other evidence as to how badly these two parents co-parent."  Heriberto contends the family court erred by refusing to receive Katrina's testimony about her text messages with him.

We cannot adequately review Heriberto's argument because the "67 pages of texts" between him and Katrina were introduced at trial are not in our record.  We therefore cannot find that the family court's ruling was erroneous or prejudicial.  (See *569 E. County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 434, fn. 9.)

In short, Heriberto fails to show that any of the family court's series of purported errors was prejudicial.

Heriberto also argues that, when taken together, the purported errors precluded him from presenting his case in violation of his due process rights. In support, he points to *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, but that case is distinguishable. There, in "an unusual and perhaps unprecedented" move, the family court declared an end to the trial while the husband's expert was in the middle of testifying. (*Id*. at p. 284.) "The trial court essentially ran the trial on a stopwatch, curtailing the parties' right to present evidence on all material disputed issues." (*Id.* at p. 292.) The family court abruptly ended a trial before the husband had finished his case-in-chief and "cut[] off any opportunity for rebuttal evidence . . . or argument of counsel" after "displaying impatience and reluctance in allowing the parties adequate time to complete their presentations." (*Id*. at p. 291.) This "summary termination of the trial infringed on [the husband's] fundamental right to a full and fair hearing." (*Ibid*.)

Nothing similar occurred here. Although the family court precluded or restricted some of Heriberto's proffered evidence (namely, testimony from S. K. and Katrina), he was allowed to present a case and offer rebuttal evidence and argument on all material issues. Even though the family court frequently expressed frustration with Heriberto's counsel and curtailed her presentation, the family court provided Heriberto a full and fair hearing over the course of four days. In our view, the trial court did not abuse its discretion to "rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the

23

court's view, are dragging on too long without significantly aiding the trier of fact." (*In re Marriage of Carlsson, supra*, 163 Cal.App.4th at p. 291.)

We therefore reject Heriberto's argument that the family court violated his due process rights and affirm the family court's custody orders.

F. *Commissioner Harris's Demeanor*

Heriberto's counsel, Lauren Laundis, who now represents him on appeal, argues at length in her opening brief that the family court (Commissioner Wendy Harris) behaved inappropriately throughout the trial. At oral argument, Ms. Laundis forcefully but respectfully reiterated and expounded her concerns with Commissioner Harris's behavior. Although we conclude Commissioner Harris did not commit reversible error, we are compelled to comment on some of her comments and behavior directed toward Ms. Laundis.

We first note that Commissioner Harris was recently admonished by the Commission on Judicial Performance (months after Heriberto's counsel filed her opening brief).[7] The admonishment arose from her behavior at proceedings in March 2022, about a month after the trial in this case, and it follows discipline from the superior court's Presiding Judge in October 2021, as well as a written reprimand from the Presiding Judge stemming from the March 2022 proceedings.

---

[7] https://cjp.ca.gov/wp-content/uploads/sites/40/2023/08/Harris_Pub_Admon_8-29-23.pdf

24

On the second day of trial, Katrina testified that Heriberto had moved about a month prior and refused to tell her his new address, so she did not know where her children were living. Commissioner Harris therefore ordered Heriberto to write his address down "this moment." Ms. Laundis objected and said she "wished to be heard on that issue," to which Commissioner Harris replied, "No, you don't." When Ms. Laundis tried to explain why neither the Family Code nor the court's previous orders required Heriberto to give Katrina his address, Commissioner Harris refused to hear the argument and told Ms. Laundis to resume examining Katrina.

Later, Ms. Laundis asked Heriberto whether Katrina was familiar with firearms. Commissioner Harris asked Ms. Laundis why she was asking the question, and she began to explain, "Ms. Rosado is going to state that she can't bring them to the [firearms] dealer because she's afraid . . . ," but Commissioner Harris cut her off, stating, "I don't care if either one of these people get arrested quite frankly . . . . I don't need to hear this testimony."

At the end of trial that day, Ms. Laundis asked for and received a continuance because her physician gave her an off-work order due to a concussion she sustained in a recent car accident. Commissioner Harris then sua sponte ordered temporary sole legal and physical custody to Katrina based on Heriberto's violation of the order to relinquish his firearms. Ms. Laundis repeatedly objected and asked to make a record, but Commissioner Harris rejected the requests because "I need no information from you."

25

Judicial officers must "be patient, dignified, and courteous to litigants." (Cal. Code Jud. Ethics, canon 3(B)(4).) They must also "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." (Cal. Code Jud. Ethics, canon 2(A).) At a minimum, Commissioner Harris's comments outlined above come across in the reporter's transcript as discourteous, impatient, and demeaning, particularly to Ms. Laundis.

Although we affirm Commissioner Harris's orders, we do not condone the unprofessional manner in which she frequently spoke to Ms. Laundis throughout the trial.

IV.

DISPOSITION

The family court's custody orders are affirmed. Katrina may recover her costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

26